**C O N F I D E N T I A L**
PROPERTY OF U.S. COURTS.

This document is not to be disclosed to any
party not officially involved in the pre and
post sentencing aspects of this case without
approval of the Court, Rule 32 (e)

**SD/FL PACTS #2305253**

Pursuant to the U.S. Supreme Court decision in **U.S. v Booker**, 125 S.Ct. 738(2005), the sentencing guidelines presented herein are advisory and not binding on the Court.

## UNITED STATES DISTRICT COURT
## FOR THE
## SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **PRESENTENCE INVESTIGATION REPORT** |
| | ) | |
| | ) | |
| **v.** | ) | **Docket No.  113C 2:16CR14021** |
| | ) | **Defendant No. 001** |
| **BRYAN GROVER MARLEY** | ) | **Guidelines Manual: 2016** |

---

**Prepared for:**     The Honorable Robin L. Rosenberg
District Court Judge

**Prepared by:**     Edward L. Cooley
Senior U.S. Probation Officer
United States Courthouse
101 S. U.S. HWY 1, Suite 1094
Fort Pierce, FL 34950
772-467-2367
Edward_Cooley@flsp.uscourts.gov

<u>**Assistant U.S. Attorney**</u>

Daniel E. Funk
500 S. Australian Avenue
Suite 400
West Palm Beach, FL 33401
561-355-7183
Daniel.funk@usdoj.gov

<u>**Defense Counsel**</u>

David Marc Trontz
3250 Mary Street
Suite 406
Coconut Grove, FL 33133
305-444-0030
trontz@dmt-law.com

**Sentence Date:**     November 4, 2016, Fort Pierce, FL

**Offense:**         **Count 1**:
Dealing firearms without a license
18 U.S.C. §§ 922(a)(1)(A) and 924(a)(1)(D)
Not more than 5 years imprisonment/$250,000 fine/$100 special assessment
(Class D Felony)

                                          **Count 2**:
Making a false statement to a firearms dealer
18 U.S.C. §§ 922(a)(6) and 924(a)(2)
Not more than 10 years imprisonment/$250,000 fine/$100 special assessment
(Class C Felony)

**Arrest Date:**     4/13/2016

**Release Status:**     4/14/2016: Released and $300,000 personal surety bond with supervision

**Detainers:**     None

**Codefendants:**     None

**Related Cases:**     Docket No. 16-14029-CR-ROSENBERG/Southern District of Florida
Docket No. 16-14030-CR-MIDDLEBROOKS/Southern District of Florida
Docket No. 16-14031-CR-ROSENBERG/Southern District of Florida
Docket No. 16-14032-CR-ROSENBERG/Southern District of Florida

                  **Date Report Prepared:**                     **Date Report Revised:**
                      September 28, 2016

**Identifying Data:**



Bryan Marley
SDFL PACTS 2305253

| | |
|---|---|
| **Date of Birth:** | February 20, 1956 |
| **Age:** | 60 |
| **Race:** | White |
| **Hispanic Origin:** | Non-Hispanic origin |
| **Sex:** | Male |
| **SS#:** | 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 |
| **FBI#:** | P2VM009TX |
| **USM#:** | 13182-104 |
| **State ID#:** | None assigned |
| **ICE#:** | None assigned |

| | |
|---|---|
| **Other ID#:** | FLDL# M640-067-56-060-0 |
| **DNA Collected** | No |
| **Education:** | Some College |
| **Dependents:** | None |
| **Citizenship:** | U.S. Citizen |

| | |
|---|---|
| **Legal Address:** | 1655 Lakeview Drive |
| | Apt. # B-101 |
| | Sebring, FL 33870 |

| | |
|---|---|
| **Aliases:** | None |

*Restrictions on Use and Redisclosure of Presentence Investigation Report.* Disclosure of this presentence investigation report to the Federal Bureau of Prisons and redisclosure by the Bureau of Prisons is authorized by the United States District Court solely to assist administering the offender's prison sentence (i.e., classification, designation, programming, sentence calculation, pre-release planning, escape apprehension, prison disturbance response, sentence commutation, or pardon) and other limited purposes, including deportation proceedings and federal investigations directly related to terrorist activities. If this presentence investigation report is redisclosed by the Federal Bureau of Prisons upon completion of its sentence administration function, the report must be returned to the Federal Bureau of Prisons or destroyed. It is the policy of the federal judiciary and the Department of Justice that further redisclosure of the presentence investigation report is prohibited without the consent of the sentencing judge.

## PART A. THE OFFENSE

### Charge(s) and Conviction(s)

1. **On August 22, 2016, the defendant pled guilty to Counts One and Two of a five-count Indictment. Count One charged dealing firearms without a license, in violation of 18 U.S.C. §§ 922(a)(1)(A) and 924(a)(1)(D); and Count Two charged making a false statement to a firearms dealer, in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2). The Indictment includes a forfeiture count, and the government is seeking forfeiture.**

2. Pursuant to a written plea agreement, the government agreed to dismiss the remaining counts after sentencing. The government agreed to recommend a two-level, or, if applicable, a three-level reduction for acceptance of responsibility, pursuant to § 3E1.1. This is a conditional recommendation as detailed in paragraph seven of the written plea agreement.

3. The defendant agreed to forfeit all rights, title and interest in all assets which are subject to forfeiture, as outlined in the written plea agreement.

4. Pretrial services records indicate the defendant has complied with all Court ordered conditions of release.

### Related Cases

5. On August 5, 2016, Erik Desmond Flippin pled guilty to possession of a firearm by a prohibited person in Southern District of Florida Docket No. 16-14029-CR-ROSENBERG. The circumstances of this offense are summarized in the offense conduct section, and sentencing is scheduled for October 11, 2016.

6. On July 14, 2016, Wili Vignolo pled guilty to possession of a firearm by a felon in Southern District of Florida Docket No. 16-14030-CR-MIDDLEBROOKS. The circumstances of this offense are summarized in the offense conduct section, and on September 22, 2016, Vignolo was sentenced to 18 months imprisonment and two years supervised release.

7. On August 5, 2016, Randy Johnston pled guilty to possession of a firearm by a felon in Southern District of Florida Docket No. 16-14031-CR-ROSENBERG. The circumstances of this offense are summarized in the offense conduct section, and sentencing is scheduled for October 11, 2016.

8. On August 10, 2016, Uriah Tobias Harris, Jr., pled guilty to possession of a firearm by a felon in Southern District of Florida Docket No. 16-14031-CR-ROSENBERG. The circumstances of this offense are summarized in the offense conduct section, and sentencing is scheduled for October 19, 2016.

**The Offense Conduct**

9.      A Federal Firearms License (FFL) is a license required by 18 U.S.C. § 923, which enables an individual or company to engage in the business of manufacturing, importing or dealing in firearms.  An FFL is required to complete and maintain records concerning the receipt, sale, and transfer of firearms which are subject to inspection and examination by the government.  An individual or company that holds an FFL must require customers to complete a Bureau of Alcohol, Tobacco, Firearms and Explosives (BATF) Form 4473 whenever a firearm is sold or transferred to an individual.  This form is designed to identify the serial number and type of firearm sold, the seller, the person purchasing the firearm and whether or not the purchaser is eligible to possess or buy a firearm.

10.     Eligibility to purchase a firearm is determined by the person's answers to a series of questions on Form 4473, which cover a list of disqualifying factors under federal law; including whether the person has been convicted of a felony, has been convicted of a misdemeanor domestic violence offense, has a history of drug abuse or mental incapacity and/or whether the person has legal status in the United States.  After Form 4473 is completed and signed by the purchaser, the FFL is obligated under federal and state law to contact the Florida Department of law Enforcement to conduct a background check and obtain approval of the sale.  In addition, if the purchaser does not hold a valid concealed firearms license, the customer must wait three to five business days from the date of purchase to receive the firearm in Florida.  If an individual purchases two or more handguns from an FFL during any five day period, the FFL is required to notify the BATF through the filing of a "multiple purchase form."

11.     On March 12, 2016, BATF Special Agent (SA) James Houk received information from an FFL who was the owner of Spray and Pray Guns and Ammo located in Sebring, Florida, indicating that between July 3, 2015 and March 7, 2016, **Bryan Grover Marley** had purchased or had transferred to him approximately 143 handguns and 9 rifles.

12.     Investigation revealed that on August 4, 2015, **Marley** purchased a Taurus .38 caliber revolver from Spray and Pray Guns and Ammo.  On the Form 4473 associated with the purchase, **Marley** had indicated he was the actual purchaser of the firearm.  On September 4, 2015, the handgun was recovered during execution of a search warrant at a marijuana grow house during which an unlawful alien was in possession of the firearm.

13.     As the investigation progressed, SA Houk determined that, **Marley** had multiple posts on the social networking website Facebook in which he indicated he was selling firearms, including Ruger .380 caliber semi-automatic pistols, Ruger double-action revolvers, Smith & Wesson .38 caliber revolvers, Smith & Wesson

.380 caliber semi-automatic pistols and DPMS AR-15 .223 caliber rifles. In the posts, **Marley** stated that, the firearms were new in the box, and it was determined he was charging 30-45 percent more for the firearms than he was paying to acquire them.

14.   On March 29, 2016, an undercover (UC) law enforcement officer telephoned **Marley** and discussed the purchase of a Ruger .380 caliber semi-automatic pistol that **Marley** had posted for sale on Facebook.  During the ensuing conversation, **Marley** stated the firearm was brand new, had never been fired and was still in the box.  **Marley** also indicated he had several Ruger .380 caliber pistols for sale, and he would sell the UC the pistol for $270.  **Marley** also advised the UC that no background check would be required, and there would be no sales tax.

15.   On March 30, 2016, the UC telephoned **Marley** and arranged to purchase the Ruger .380 caliber semi-automatic pistol from him the following day.  **Marley** advised the UC he only needed a valid Florida driver's license, and he indicated he would provide the UC with a bill of sale.

16.   On March 31, 2016, the UC met with **Marley** in the parking lot of a pharmacy on U.S. Highway 27 in Sebring, Florida, and purchased the Ruger .380 caliber pistol from him inside **Marley's** vehicle.  During the transaction, Marley presented the UC with two paper "bill of sale" forms. **Marley** asked the UC for his driver's license and filled out one of the bill of sale forms which he retained.  He then provided the UC with the second bill of sale form which the UC filled out and kept. It was subsequently determined that **Marley** had purchased the Ruger .380 caliber pistol, along with four others, 16 days prior to the transaction with the UC.

17.   Additional investigation revealed that **Marley** had completed Form 4473s pertaining to multiple purchases of firearms at Spray and Pray Guns and Ammo when he purchased a total of 143 handguns on 17 separate occasions between July 29, 2015 and March 15, 2016.  These purchases consisted of three Ruger .38 caliber revolvers, one Smith & Wesson .38 caliber revolver and two Taurus .38 caliber revolvers on July 29, 2015; three Smith & Wesson .38 caliber revolvers, three Taurus .38 caliber revolvers, one Ruger .380 caliber pistol, one Ruger .38 caliber revolver and one Taurus .45 caliber revolver on August 4, 2015; three Ruger .380 caliber pistols, three Taurus .380 caliber pistols and five Taurus .38 caliber revolvers on August 13, 2015; three Ruger .380 caliber pistols, seven Taurus .380 caliber pistols, two HS XDS .45 caliber pistols, five Smith & Wesson Shield pistols, two SAR Arms 9mm pistols, two Smith and Wesson .38 caliber revolvers, two Smith & Wesson .380 caliber pistols, one Taurus .38 caliber revolver and one Taurus .45 caliber revolver on August 25, 2015; two Taurus .45 caliber revolvers, one Hipoint .380 caliber pistol, one Iberia .40 caliber pistol, one Haskell .45 caliber pistol, two Walther .22 caliber pistols, two HS XDS .45 caliber revolvers, two Ruger .380 caliber pistols, two Ruger .22 caliber pistols and one

Taurus .380 caliber pistol on September 15, 2015; three Taurus 9mm pistols, one Iberia .40 caliber pistol and one Haskell .45 caliber pistol on September 23, 2015; three Taurus 9mm pistols on October 20, 2015; two Glock .40 caliber pistols on November 28, 2015; two Glock .40 caliber pistols on December 4, 2015; two Ruger .380 caliber pistols and two Smith & Wesson .40 caliber pistols on December 15, 2015; ten Ruger .380 caliber pistols on January 4, 2016; two Ruger .380 caliber pistols, two Smith and Wesson .38 caliber revolvers, two Taurus 9mm pistols and two Kahr Arms 9mm pistols on January 7, 2016; four Ruger .380 caliber pistols on January 15, 2016; Three Taurus .38 caliber revolvers on February 1, 2016; 15 Ruger .380 caliber pistols and six Taurus 9mm pistols on February 8, 2016;  two Smith & Wesson .380 caliber pistols on March 7, 2016; and five Ruger .380 caliber pistols on March 15, 2016.

18.     On April 13, 2016, BATF agents and local law enforcement officers executed a federal search warrant at **Marley's** residence located in Sebring, Florida.  During the search, agents recovered approximately 171 "bill of sale" forms that were similar to the ones filled out during the transaction with the UC on March 31, 2016.   The bill of sale forms ranged from June 19, 2015 to April 11, 2016.  Also seized during execution of the search warrant were 14 firearms, including four Ruger .380 caliber pistols and a DPMS Oracle .223 caliber rifle.  The firearms appeared to be new and were in their original boxes.

19.     A review of the "bill of sale" forms found in **Marley's** residence indicated seven of the forms had been filled out and signed by an individual named Jennifer Britt, and these forms were for the purchase of a DPMS AR-15 .223 caliber rifle on March 14, 2016; a Ruger .380 caliber semi-automatic pistol on March 4, 2016; a Ruger .380 caliber semi-automatic pistol on December 31, 2015; a Smith and Wesson .40 caliber semi-automatic pistol on December 15, 2015; a DPMS AR-15 .233 caliber rifle on December 15, 2015; a Ruger .380 caliber semi-automatic pistol on an unknown date; and a Smith and Wesson .40 caliber semi-automatic pistol on August 19, 2015.   In the upper right hand corner of the form dated March 4, 2015 for the sale of a Ruger .380 caliber semi-automatic pistol was the note, "Wili Vignolo 863-243-4022."  Attached to the form dated August 19, 2015 for the sale of a Smith and Wesson .40 caliber semi-automatic pistol was a yellow post-it note with the message "Girlfriend of Will Vignolo" written on it.  During the investigation, it was determined that Britt had purchased the firearms from **Marley** on behalf of her boyfriend, Wili Vignolo, and on March 28, 2000, Vignolo had been convicted of the felony offense of grand theft in the third degree in Broward County, Florida, Case No. 98-25173CF.

20.     One of the "bill of sale" forms reflected the sale by **Marley** to Erik Desmond Flippin of a Taurus .38 caliber revolver on February 11, 2016.   Additional investigation revealed that Flippin had been convicted on July 25, 2005 of a

misdemeanor crime of domestic violence in Highlands County, Florida, Case No. 05-799-MM.

21.    One of the "bill of sale" forms reflected the sale by **Marley** to Uriah Tobias Harris, Jr., of a Ruger .380 caliber pistol on April 2, 2016.   Additional investigation revealed that Harris had been convicted on September 21, 2011 of the felony offenses of child abuse in Highlands County, Florida, Case Nos. 10-1142-CF and 11-53-CF.

22.    One of the "bills of sale" forms reflected the sale by **Marley** to Randy Johnston of a Taurus .380 pistol on August 31, 2015.   Additional investigation revealed that Johnston had been convicted on March 27, 1990 of the felony offense of grand theft in Highlands County, Florida, Case No. 88-90-CF.

23.    During the investigation, **Marley's** Facebook records were obtained, and a review of these records revealed approximately 5,000 pages of conversations between **Marley** and others, including Vignolo, Flippin and Johnston, regarding firearms transactions.   One such conversation occurred on August 11, 2015, when **Marley** sent a message to an individual identified as Cannon Bobo stating "Hi, I just spoke to my supplier and they said it should deliver via FedEx this Thursday I am again sorry for the delay, take care."   On August 12, 2015, **Marley** sent a message to Bobo stating "Hi, FedEx came back late yesterday and the supplier had shipped your gun separately so I do have it Just let me know when you want to meet and again sorry for the delay Bryan."   Bobo responded that same date by stating, "Wow thank you Bryan I'm at work but plan to be off between noon or 2. If I can call you on my way home or message u when it looks like I'm getting close and maybe go meet. Whatever wow Betsy for u sir."   Records revealed that on August 11, 2015, **Marley** had filled out a BATF Form 4473 at Spray and Pray Guns and Ammo for the purchase of five firearms.   On the form, **Marley** had indicated he was the actual buyer of the firearms.   One of the firearms purchased on this date was a Taurus .380 caliber pistol the defendant sold to Bobo on August 12, 2015.

24.    On May 19, 2016, a federal search warrant was executed at Vignolo's residence in Lake Placid, Florida. During the ensuing search, agents found a Smith and Wesson .40 caliber semi-automatic pistol, a DPMS AR-15 .223 caliber rifle with a 20 round magazine and a Ruger .380 caliber semi-automatic pistol.   During questioning, Vignolo admitted he and/or his girlfriend, Jennifer Britt, had purchased approximately seven firearms from **Marley**, including the firearms found during the search warrant.

25.    On May 19, 2016, a federal search warrant was executed at Flippin's residence in Sebring, Florida.   The firearm in question was not located, and the defendant indicated it had been sold to a friend because his girlfriend did not want it in the residence.   Flippin admitted he had purchased a Smith and Wesson .40 caliber

pistol and a Taurus .38 caliber revolver sometime in 2016, but he could not recall the dates. Flippin said he had contacted **Marley** through Facebook, and he picked him out of a photographic lineup.    Flippin was shown the bill of sale form seized from **Marley's** residence, and he admitted the Taurus .38 caliber revolver identified on the form was one of the firearms he had purchased.

26.    On May 19, 2016, a federal search warrant was executed at Johnston's residence in Avon Park, Florida. During the ensuing search, agents found a Taurus .380 caliber pistol along with a bill of sale for the firearm documenting the sale of the weapon from **Marley** to Johnston.  Johnston admitted that he and his girlfriend met with **Marley** to purchase the firearm. Johnston acknowledged a Facebook conversation he had with **Marley** regarding the purchase of the Taurus pistol, and he acknowledged a Facebook conversation he had inquiring if **Marley** had any rifles for sale.

27.    On May 22, 2016, a federal search warrant was executed at Harris' residence in Sebring, Florida.  The firearm in question was not located, but agents found six rounds of .380 caliber ammunition in a night stand in the defendant's bedroom. During an interview, Harris admitted he had purchased a Ruger .380 caliber pistol from **Marley** for $275, and had subsequently given the firearm to his cousin. Harris said he had contacted **Marley** to purchase the firearm through Facebook.

28.    According to the government, there is no evidence to suggest the defendant committed the offense with knowledge, intent, or reason to believe the offense would result in the transfer of a firearm or ammunition to a prohibited person.

**Role Assessment**

29.    **Bryan Grover Marley** acquired a large number of firearms and sold them to various individuals after posting them for sale on a social networking website. **Marley** was not a licensed firearms dealer, and some of the individuals to whom he sold firearms were convicted felons and/or prohibited persons.   **Marley** is responsible for 185 firearms.   Neither an aggravating not mitigating role adjustment pursuant to §§ 3B1.1 or 3B1.2 is recommended.

30.    Erik Desmond Flippin, Wili Vignolo, Randy Johnston and Uriah Tobias Harris, Jr., are prohibited person or convicted felons who purchased firearms from **Bryan Grover Marley**.   No aggravating or mitigating role adjustments are recommended.

**Victim Impact**

31.    These are Title 18 offenses and there is no identifiable victim.

**Adjustment for Obstruction of Justice**

32.  The probation officer has no information indicating the defendant impeded or obstructed justice.

**Adjustment for Acceptance of Responsibility**

33.  The defendant, through defense counsel, provided the following written statement to the probation officer:

"I, Bryan Grover Marley, with the help of my attorney, am providing this statement concerning my involvement in this offense for the Court to consider at my sentencing.

"I was born and raised in Tieton, Washington.  My parents, Robert Marley and Georgeann Marley are still living and have been married for 61 years.  My parents owned an apple orchard.  I worked in the orchard starting at age 12.  I have always had a job and worked. For 28 years I had a successful career in Foodservice Distribution. I was a Purchasing/Marketing manager.  I had to resign in 2008 when I was diagnosed with the disease, Multi-Focal Motor Neuropathy.

"Growing up we lived in the country in the foothills of the Cascade Mountains. Hunting for game was just a normal part of life.  Everything we hunted was used for food.  We were not well off financially so hunting deer and elk each season was important to be able to stock the freezer with meat to last throughout the year. I started hunting at age 12.  Guns were just a part of life.  I have owned several guns my entire life and hunted up until 10 years ago when I was diagnosed with the disease I currently have.  Due to the weakness it causes in my hands, arms and legs I have been unable to hunt.

"I began using Facebook so I could access pictures my children posted of their families.  I became aware of local Facebook groups I could join.  Many items were for sale by local people.  I began selling items I had in storage and didn't need.  I found it to be a very easy to sell these items.  I noticed many guns for sale on the group postings.  I decided to see some of the guns I had owned for many years since I couldn't hunt anymore and they sold quickly.

"Finding how effective selling on Facebook had been, I thought I might be able to supplement my Social Security Disability income with some gun sales.  I bought some new guns and posted them for sale on Facebook.  I believe the overall average markup was in the range of 20% to 25%.  I also advertised in the local newspaper occasionally.  I called the Tampa ATF Office and spoke to Agent Mike Lunsford on 8/11/15.  I asked him if it was legal in Florida for individuals to sell guns to other individuals.  He said it was as long as the buyer was a Florida

resident and not a felon.  Although not a requirement, he recommended making out a bill of sale and including the buyers name, address and phone.  He also recommended taking down their driver's license number.  I created a bill of sale form on my computer which I used to sell these guns.  I had bills of sales for all of these new guns I sold.  I preferred taking down the buyer's Concealed Carry License number since this showed they passed a background check.  I was able to get this from about one third of the buyers.  I took down the Florida Driver's License number of the rest of the buyers.  I had researched to see if there was a way for an individual to do a background check on a potential buyer but there wasn't.  A copy of the bill of sale I used when selling guns to individuals is included with this statement.

"My interest in guns had always been a hobby.  Unfortunately, when I began repetitively buying and selling guns for profit it transitioned from a hobby to being 'engaged in the business of selling firearms' which is a crime.  In 60 years I had never been arrested and had no record.  I always considered myself a productive, contributing and law abiding citizen.  I am ashamed and deeply regret breaking the law by dealing firearms without a license and making a false statement to a firearms dealer.  I have told all of my family and friends of the crime I committed.  I feel ashamed and very sorry to have put them through this ordeal due to my terrible lapse in judgement.  It has been hardest on my wife, son, daughter and my two elderly parents that are ill.

"After my arrest, I cooperated with the agents.  I told them where they could find the file containing all of my bills of sales for the guns I sold.  I told them I would fully cooperate to give them any information that they needed regarding individuals that purchased guns from me.  I also opened my gun safe at their request.  During plea agreement discussions with the Assistant U.S. Attorney, he asked me to give him information on 9 individuals I had sold to.  I gave them everything I knew about each of them.

"At my first meeting with my attorneys, they told me that the profit from the gun sales should be reported as income on my tax return.  I was unaware of this but immediately amended my 2015 tax return so I could report this income.

"I have never done anything like this before in my life.  I am embarrassed by my actions.  No one in my family has ever been arrested or convicted of a crime.  I have caused irreparable damage to my family for which I am ashamed.  I will have to live with the consequences of my actions for the rest of my life."

/s/ Bryan Grover Marley

<u>**Offense Level Computation**</u>

34.  The guideline for each of Counts One and Two is found in § 2K2.1, and the counts are grouped together pursuant to § 3D1.2(d) because that section specifically indicates offenses covered by § 2K2.1 are to be grouped together.

35.  **Base Offense Level:** The guideline for 18 U.S.C. §§922(a)(1)(A) and 922(a)(6) is found in § 2K2.1.  That section indicates that an offense involving unlawful receipt of firearms or unlawful transactions involving firearms has a base offense level of 12, § 2K2.1(a)(7).                                              **<u>12</u>**

36.  **Specific Offense Characteristics:**  The offense involved 185 firearms.  Since the offense involved at least 100 firearms but less than 200 firearms, there is an eight level increase pursuant to § 2K2.1(b)(1)(D).                              **<u>+8</u>**

37.  **Victim Related Adjustment:** None                                              **<u>0</u>**

38.  **Adjustment for Role in the Offense:** None                                              **<u>0</u>**

39.  **Adjustment for Obstruction of Justice:** None                                              **<u>0</u>**

40.  **Adjusted Offense Level (Subtotal):**                                              **<u>20</u>**

41.  **Chapter Four Enhancement:** None                                              **<u>0</u>**

42.  **Acceptance of Responsibility:** The defendant has clearly demonstrated acceptance of responsibility for the offense. Accordingly, the offense level is decreased by two levels, § 3E1.1(a).                                              **<u>-2</u>**

43.  Pursuant to § 3E1.1(b), for the defendant to receive the additional one-level decrease, the government must file a motion stating the defendant assisted authorities in the investigation of his own misconduct by timely notifying authorities of his intention to plead guilty.                                              **<u>-1</u>**

44.  **Total Offense Level:**                                              **<u>17</u>**

## PART B. THE DEFENDANT'S CRIMINAL HISTORY

<u>**Juvenile Adjudication(s)**</u>

45.  None

<u>**Adult Criminal Conviction(s)**</u>

46.  None

### Criminal History Computation

47.     The defendant has zero criminal history points. According to the Sentencing Table in Chapter 5, Part A, zero criminal history points establish a criminal history category of I.

### Other Criminal Conduct

48.     None

### Pending Charges

49.     None

### Other Arrests

50.     None

## PART C. OFFENDER CHARACTERISTICS

### Personal and Family Data

51.     The defendant was interviewed for the presentence report at the U.S. Probation Office in Fort Pierce, Florida, on August 25, 2016.  His social history was verified during a telephonic interview of his brother, Kerry Marley, on September 27, 2016.

52.     The defendant was born on February 20, 1956 in Yakima, Washington, to Robert Marley and Georgeann Gray Marley.  His father, age 80, resides in Sequim, Washington, and is a retired bank manager and realtor.  The defendant's mother, age 79, resides with the defendant's father and is a homemaker.  The defendant has one sibling.  Kerry Marley, age 56, resides in San Diego, California, and is employed as a corporate trainer for a furniture company and as an interior designer.  The defendant has a close relationship with all family members.

53.     The defendant was raised by his parents in Tieton, Washington under middle-income conditions, and he lived at home until he was about 18 years of age when he left to attend college.  He then lived in Tulsa, Oklahoma, for about one year before moving to the Seattle, Washington area.  In the late 1970s, he moved to San Diego, California, and subsequently lived in Milwaukee, Wisconsin, and Rock Island, Illinois, until 2008 when he moved to Boca Raton, Florida.  In 2009, the defendant moved to Sebring, Florida, and for the past two and one half-years, he has resided at his current residence located at 1655 Lakeview Drive, #B-101, Sebring, Florida.  A home visit was conducted at this residence by the U.S. Probation Officer supervising the defendant on bond.  The residence was

described as a two bedroom two bathroom condominium unit located on the ground floor. No firearms or other contraband are known to be present. According to the Highlands County Property Appraiser's Office, the defendant purchased the 1,200 square foot residence in 2014 for $64,000. The property is currently assessed at $77,098 for real estate tax purposes.

54. In 1977, the defendant married Colleen Bradley, age 62, in Seattle, Washington. This marriage resulted in two adult children, and as verified through information obtained through the Highlands County, Florida, Clerk of Court, ended in divorce in July 2012. The defendant's son, Jason Marley, age 38, resides in Bozeman, Montana, and is employed as a medical doctor. The defendant's daughter, Rachel Nawrocki, age 36, resides in Knoxville, Tennessee, and is a college professor. The defendant and his former wife raised both children who are financially independent.

55. According to the defendant, since 2012 he has been involved in a relationship with Krysti Wilson, age 58. Although not legally married, the defendant said he and Krysti were recently married by a minister. He said they may never legally marry because it will negatively impact their individual financial situations. Krysti is reportedly employed as a nurse and has net income of about $2,400 per month.

**Physical Condition**

56. The defendant is a white/non-Hispanic male who stands six feet four inches, weighs 325 pounds and has brown eyes and brown/gray hair. He does not have any significant identifying scars. The defendant reported several health issues. Most notably, about ten years ago he was diagnosed with Multi-Focal Motor Neuropathy (MMN), a condition which affects the nerves to his muscles and causes weakness in the arms and legs. According to a copy of a letter provided by the defendant that was authored by Dr. Marc Feinberg of South Florida Neurology Associates located in Boca Raton, Florida, the defendant was diagnosed with MMN in 2008, and he is being treated with intravenous immune globulin every six weeks. The treatment is administered over two consecutive days with each infusion lasting about four hours. He is also given Benadryl and steroid infusions during the treatments. Post infusion, the defendant suffers from flu-like conditions, and as the infusion wears off, he becomes weaker. Dr. Feinberg also indicated the defendant suffers from sleep apnea and requires the use of a CPAP mask. According to information obtained independently by the probation officer from South Florida Neurology Associates, the defendant was diagnosed with MMN and sleep apnea, is prescribed intravenous immune globulin infusions and Zoloft, and his treatment is ongoing.

57. According to the defendant, over the last few years he has also been diagnosed with diabetes Type II, high blood pressure and high cholesterol. He said these

conditions are being monitored and treated with various medications by Dr. Bipin Bhatt and Dr. Eric Palosky whose offices are located in Sebring, Florida. According to a letter provided by the defendant that was authored by Dr. Bhatt, the defendant has been under his care since 2011 and suffers from MMN, insomnia and severe sleep apnea.  Dr. Bhatt indicated the defendant requires the use of a CPAP machine every night and is prescribed zolpidem tartrate.  According to information obtained independently by the probation officer from Dr. Bhatt, the defendant was last seen in May 2016, and he has a history of sleep apnea, occasional bronchitis, longstanding hypertension, peripheral neuropathy, mild restrictive lung disease, non-insulin dependent diabetes and MMN.

58.    According to a letter provided by the defendant that was authored by Dr. Palosky, the defendant has been diagnosed with diabetes Type II, high blood pressure, anxiety, panic attacks, MMN, high cholesterol, insomnia and severe sleep apnea. He is prescribed metformin, glipizide, lisinopril, sertraline, alprazolam, atorvastatin and zolpidem, and he requires nightly use of a CPAP machine.  A written request for independent verification was sent to Dr. Palosky and is pending.

**Mental and Emotional**

59.    The defendant reported no history of mental or emotional health issues.  However, as indicated above, he is prescribed Zoloft (sertraline) and alprazolam which the defendant reported were for stress and anxiety caused by his legal situation.

**Substance Abuse**

60.    According to the defendant, he began to consume alcohol on an occasional basis when he was about 24 years of age.  He reported no use of illegal substances, and a urine sample submitted to the probation office on August 25, 2016 tested negative for illicit substances.

**Educational and Vocational Skills**

61.    According to the defendant, in 1974 he graduated from Highland High School located in Cowiche, Washington.  According to transcripts provided by this school, the defendant was awarded a standard high school diploma on May 31, 1974.  He had a cumulative grade point average of 3.280 and was ranked 14th out of 67 students.

62.    According to the defendant, following high school he enrolled at Oral Roberts University located in Tulsa, Oklahoma.  He said he attended this university for about one year and was not awarded a degree.  According to transcripts provided by this university, the defendant was enrolled in the Fall 1974 semester and Spring

1975 semester, earned 33 credits and had a cumulative grade point average of 3.63.

63.    According to the defendant, after he withdrew from Oral Roberts University, he enrolled at the K.T. Bible Academy located in Mount Lake Terrace, Washington. He indicated he completed a religious studies program in 1979, but since this academy was not accredited, he was not awarded a degree. A listing for K.T. Bible Academy could not be located. Therefore, this education is not verified.

**Employment Record**

64.    Since 2008, the defendant has been disabled due to his diagnosis with Multi-Focal Motor Neuropathy, and he receives Social Security Disability benefits of $2,491 per month.

65.    According to the defendant, for three months in 2008, he was employed by U.S. Foods located in Boca Raton, Florida. He said he was vice-president of marketing, had a yearly salary of about $140,000 per year and resigned due to medical issues. A written request for verification was forwarded to this company and is pending.

66.    According to the defendant, from 1999 until 2008, he was employed by Performance Foods located in Rock Island, Illinois. He said he was vice-president of procurement, earned about $150,000 per year and was terminated for unspecified reasons. According to information provided by this company, the defendant held the positon of vice-president of procurement, earned $149,125 per year and was terminated due to performance.

67.    According to the defendant, following college he was employed as a minister for about four years. He then went into the food distribution industry.

**Financial Condition: Ability to Pay**

68.    The following information was obtained by interviewing the defendant, examining financial records and by conducting an independent investigation of other sources as outlined in the analysis below.

<u>Assets and Liabilities Summary</u>

Cash

| | |
|---|---|
| IRA (Capital One) | $ 177,000 |
| Checking account (Harbor Community Bank) | 3,500 |

Unencumbered Assets

| | |
|---|---|
| Residence | $ 77,000 |
| 2014 Ford Fusion | 11,500 |
| 2002 Buick Lesabre | 1,300 |
| 2000 Suzuki motorcycle | 1,200 |

Equity in Other Assets

| | |
|---|---|
| None | $        0 |
| **TOTAL ASSETS** | **$ 271,500** |

Unsecured Debts

| | |
|---|---|
| None | $        0 |
| **TOTAL UNSECURED DEBTS** | **$        0** |

| | |
|---|---|
| Net Worth | **$ 271,500** |

<u>Monthly Cash Flow</u>

| | |
|---|---|
| Social Security Disability | $   2,491 |
| Significant Other Net Income | 2,426 |
| **TOTAL INCOME** | **$   4,917** |

Reported Living Expenses

| | |
|---|---|
| Health insurance | $      880 |
| Groceries | 600 |
| Utilities | 450 |
| Transportation | 265 |

17

| | |
|---|---:|
| HOA fees | 250 |
| Medical copayments/deductibles | 250 |
| Car Insurance | 150 |
| Property tax | 50 |
| **TOTAL REPORTED EXPENSES** | **$ 2,645** |
| Net Monthly Cash Flow | **$ 2,272** |

### Analysis

69. The defendant reported the above information to the probation officer on a personal financial statement, and he provided detailed supporting documentation. No other significant assets were located by the probation officer, and a credit report obtained through Equifax Credit Information Services confirmed he does not have any unsecured liabilities.

70. The defendant is currently able to meet his reported monthly living expenses with his social security disability income and his girlfriend's net income, and they enjoy a modest positive cash flow. However, not included in the chart above are expenses reported by the defendant pertaining to entertainment, financial support he provides to his parents, legal fees, Christmas and birthday gifts for his five grandchildren, and various other incidental expenses. As such, his net monthly cash flow may be somewhat lower than indicated above.

71. According to copies of income tax returns provided by the defendant, his adjusted gross income for the years 2013 through 2015 was $2,277, $16,592 and $10,159, respectively. According to the defendant, the 2015 return was amended on advice of his attorneys to include income he received through the sale of the firearms involved in this case. He indicated he reported this income as $9,690 on the amended return because he did not have access to various receipts that were seized by agents. However, he believes it was actually between $4,000 and $5,000.

72. Although the defendant enjoys a modest net worth, it stems primarily from his ownership of a small residence and funds in a retirement account. The defendant is disabled, and it is unlikely he will earn significant income in the future given his medical condition and age. He also faces a term of imprisonment in this case.

73. Based on the defendant's current financial situation, it does not appear he has the ability to pay a fine in this case.

## PART D. SENTENCING OPTIONS

### Custody

74. **Statutory Provisions:** As to Count One, the maximum term of imprisonment is five years, 18 U.S.C. § 924(a)(1)(D). As to Count Two, the maximum term of imprisonment is ten years, 18 U.S.C. § 924(a)(2).

75. **Guideline Provisions:** Based upon a total offense level of 17 and a criminal history category of I, the guideline imprisonment range is 24 to 30 months.

### Supervised Release

76. **Statutory Provisions:** As to each of Counts One and Two, the Court may impose a term of supervised release of not more than three years, 18 U.S.C. § 3583(b)(2).

77. **Guideline Provisions:** Supervised release shall be ordered when required by statute, § 5D1.1(a)(1); except as provided in subsection (c), when the Court imposes a term of imprisonment of more than one year, § 5D1.1(a)(2); or to follow imprisonment in any other case, § 5D1.1(b). The guideline range for a term of supervised release is at least one year but not more than three years, § 5D1.2(a)(2).

### Probation

78. **Statutory Provisions:** As to each of Counts One and Two, the defendant is eligible for a term of not less than one nor more than five years probation by statute, 18 U.S.C. § 3561(c)(1). Because the offenses are felonies, all applicable mandatory conditions shall be imposed, including a condition for either restitution to the victim or community service, unless the Court has imposed a fine, or unless the Court finds on the record that extraordinary circumstances exist that would make such a condition plainly unreasonable, 18 U.S.C. § 3563(a).

79. **Guideline Provisions:** Since the applicable guideline range is in Zone D of the Sentencing Table, the defendant is ineligible for probation, §5B1.1.

### Fines

80. **Statutory Provisions:** As to each of Counts One and Two, the maximum fine is $250,000, 18 U.S.C. § 3571(b)(3). A special assessment of $100 as to each count is mandatory, 18 U.S.C. § 3013.

81. **Guideline Provisions:** The fine range for this offense is from $10,000 to $95,000, §5E1.2(c)(3).

82.     In determining whether to impose a fine and the amount of such fine, the Court shall consider, among other factors, the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed, § 5E1.2(d)(7) and 18 U.S.C. § 3572(a)(6). These costs may include drug and alcohol treatment, electronic monitoring, and/or contract confinement costs. The most recent advisory from the Administrative Office of the United States Courts provides the following monthly cost data:

|  | **Bureau of Prisons Facilities** | **Community Correction Centers** | **Supervision by Probation Officer** |
|---|---|---|---|
| Daily | $88 | $71 | $11 |
| Monthly | $2,552 | $2,396 | $341 |
| Annually | $31,976 | $26,083 | $4,097 |

## PART E. FACTORS THAT MAY WARRANT DEPARTURE/VARIANCE

83.     The probation officer has not identified any factors that may warrant a departure or variance.

## PART F. IMPACT OF THE PLEA AGREEMENT

84.     None

## PART G. RECOMMENDED SPECIAL CONDITIONS OF SUPERVISION

85.   **Permissible Search:** The defendant shall submit to a search of his person or property conducted in a reasonable manner and at a reasonable time by the U.S. Probation Officer.

Respectfully Submitted,

by:   _____
Edward L. Cooley
Senior U.S. Probation Officer

Reviewed and approved:

_____
Michael Santucci
Supervising U.S. Probation Officer